J. Noah Hagey, Esq. (SBN: 262331)
    hagey@braunhagey.com
Matthew Borden, Esq. (SBN: 214323)
    borden@braunhagey.com
Ronald J. Fisher, Esq. (SBN: 298660)
    fisher@braunhagey.com
J. Tobias Rowe, Esq. (SBN: 305596)
    rowe@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

Jonathan Kortmansky, Esq. (*pro hac vice*)
    kortmansky@braunhagey.com
Molly M. Jamison, Esq. (*pro hac vice* forthcoming)
    jamison@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone:  (646) 829-9403
Facsimile:  (646) 829-9403

*Attorneys for Class Plaintiffs Manish Aggarwal, Mostafa El Bermawy,
and Others Similarly Situated*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MANISH AGGARWAL and MOSTAFA EL BERMAWY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COINBASE, INC. and COINBASE GLOBAL, INC.,<br><br>Defendants. | Case No. 4:22-cv-04829-JSW<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Manish Aggarwal and Mostafa El Bermawy on behalf of themselves, and those similarly situated, allege as follows:

**<u>INTRODUCTION</u>**

1.      This action seeks to hold Coinbase, the country's largest cryptocurrency investment platform, accountable for misrepresentations and security failures leading to the repeated theft of customers' life savings.  Through presenting its platform as "secure," Coinbase has gained the trust of thousands of small investors and has brought cryptocurrency investment and trading to the general public.  Ordinary people have entrusted Coinbase with billions of dollars in savings, and Coinbase exacts substantial fees and commissions in return.  But contrary to its representations, Coinbase does a poor job of protecting its user accounts from unlawful intrusion and thievery.  Coinbase does an even worse job of working to mitigate those thefts after they occur.  Instead of providing "24/7 live support," as promised, it forces fraud victims to navigate a faceless and impenetrable automated "customer service" process that leads nowhere.  Coinbase is acutely aware of these problems and has paid large fines to regulators.  Yet the problems persist and account holders like Plaintiffs continue to be fleeced by hackers with access to Coinbase's systems.

2.      Plaintiffs purchased several hundred thousand dollars' worth of Bitcoin and, like any liquid investment, wanted to keep it safe and be able to access it and conduct further investments and transactions.  In reliance on Coinbase's representations about the security of its platform, Plaintiffs kept their cryptocurrency in electronic "wallets" stored on Coinbase's servers.  Plaintiffs used the account like any other bank or investment holding to make transactions, withdrawals, and additional investments.

3.      In April 2022, hackers gained access to Plaintiff Aggarwal's Coinbase account through no fault of his own and, after locking him out, drained it of more than $200,000 of his family's hard-earned savings.  When Mr. Aggarwal tried to alert Coinbase, the company routed him through its automated complaint process—a recursive loop of impenetrable screens that prevented him from explaining his situation to any human being and was incapable of redressing the theft of his savings.

4.     In July 2022, Coinbase did the same thing to Plaintiff El Bermawy.  Like Mr. Aggarwal, Mr. El Bermawy found himself locked out of his account while hackers robbed it. Instead of providing support, Coinbase failed to assist Mr. El Bermawy in recovering his stolen cryptocurrency and instead canceled his account.

5.     Plaintiffs now bring this action so that they and countless others like them can be made whole, and so that others will not suffer similar misfortune.  Plaintiffs also seek injunctive relief on behalf of the general public to prevent Coinbase from continuing to misrepresent its platform as offering a secure option for investing individuals' hard-earned funds.

## JURISDICTION AND VENUE

6.     The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action is brought pursuant to the Electronic Funds Transfer Act of 1978, 15 U.S.C. § 1693 *et seq*.  The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

7.     The Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount of damages suffered by Plaintiffs and alleged herein exceeds $75,000 and diversity of citizen exists between Plaintiffs and Coinbase in that Plaintiffs are citizens of the States of Connecticut and New York, while Coinbase is a corporate citizen of the States of California and Delaware.

8.     The Court also has subject-matter jurisdiction over the action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because minimal diversity exists between Class Members and Coinbase and because the amount in controversy exceeds $5,000,000, exclusive of interests and costs.

9.     Venue is proper in this District under 28 U.S.C. § 1391(d) because Coinbase has its principal place of business and maintains its executive officers in San Francisco, California and is registered with the California Secretary of State to do business in California.  Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions" on which the claims are based occurred in this district where Coinbase's operations and witnesses are located.

**THE PARTIES**

10.     Plaintiff Manish Aggarwal is a Coinbase customer.  He is a citizen of the State of Connecticut.

11.     Plaintiff Mostafa El Bermawy is a Coinbase customer.  He is a citizen of the State of New York.

12.     Defendant Coinbase, Inc., is a publicly-traded Delaware corporation with its headquarters and principal place of business in San Francisco, California.  Defendant Coinbase, Inc. is registered with the Secretary of State of California and has an agent for services of process in California.  Coinbase is the largest cryptocurrency exchange in the United States by trading volume and claims to have more than 103 million verified users.  Defendant Coinbase, Inc. is a wholly owned subsidiary of Defendant Coinbase Global, Inc.

13.     Defendant Coinbase Global, Inc. is a Delaware corporation with its headquarters and principal place of business in San Francisco, California.  Coinbase Global, Inc. is the parent company of Coinbase, Inc.  Unless specified otherwise, Coinbase, Inc. and Coinbase Global, Inc. are referred to collectively herein as "Coinbase."

14.     Coinbase is the largest cryptocurrency institution in the U.S. and its role in the American financial system is growing in importance.  In the last fifteen years, cryptocurrency has grown from a high-tech novelty to a major asset class into which ordinary American consumers and other investors have poured hundreds of billions of dollars.

15.     Coinbase has made billions of dollars by positioning itself as a trusted repository of consumers' funds and the "most secure" platform for buying and selling cryptocurrency.  Coinbase's website touts its "best-in-class" security practices, and it claims: "we're the only crypto exchange to have never been hacked."

16.     Coinbase is the most prominent cryptocurrency repository and trading platform for ordinary consumers across the country.  Like any bank or other financial institution holding billions of dollars of consumers' funds and managing electronic transfers from custodial accounts, Coinbase must repay stolen monies to consumers under the Electronic Funds Transfer Act ("EFTA").  Coinbase also bears liability under the duties it assumes as a bailee and for the

representations it makes to the public, such as "we are required to safeguard customers' assets using bank-level security standards applicable to our wallet and storage systems."  Coinbase Global, Inc., Quarterly Report (Form 10-Q), at 94 (August 9, 2022), (available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1679788/000167978822000085/coin-20220630.htm).  Coinbase cannot shed those duties through buried disclaimer language on its website and should be required to make Plaintiffs and all similarly situated consumers whole for their losses.

## FACTS

### A.      The Rise of Cryptocurrencies

17.      Cryptocurrencies are digital assets that use decentralized computer networks, rather than a nation's central bank or other issuing authority, to uphold them.

18.      Unlike traditional currency, cryptocurrencies rely on a digital ledger, which is a publicly available database listing the complete ownership and transaction history of every "coin." The ledger is protected by strong cryptography, meaning that it would be impossible for a malicious actor to alter ownership information in the database using presently available technology. The secure ledger, combined with the limited supply of available coins, allows cryptocurrencies to function as a medium of exchange with which owners can purchase other assets (including, frequently, other cryptocurrencies).

19.      Cryptocurrencies were first theorized beginning in the 1980s, but were not adopted widely until the last fifteen years.  The most popular cryptocurrency today, Bitcoin, was launched in 2009.

20.      In a short period of time, cryptocurrencies have gone from a novelty asset owned by a few tech-savvy early adopters to a major asset class.  In 2010, in the first reported commercial transaction using Bitcoin, a buyer reportedly purchased a Papa John's pizza for 10,000 Bitcoin.

21.      At today's prices, just twelve years later, the dollar value of that pizza would have been more than $200 million.  Today, each Bitcoin is worth more than $20,000.  The total market capitalization of Bitcoin alone is more than $390 billion.  And the total market capitalization of all cryptocurrencies has been estimated at more than $2 trillion as recently as March 2022.

22.     The astronomical growth of cryptocurrency as an asset class has been fueled in large part by ordinary American consumers.  Cryptocurrency has gained popularity well beyond the early circles of technologically and financially sophisticated investors.  Today, encouraged by platforms like Coinbase, ordinary consumers invest their savings and retirement plans in cryptocurrency, in addition to millions of others who invest in the hope of profiting from the "crypto revolution."

**B.      The Role of Coinbase**

23.     To trade in cryptocurrencies, consumers rely on a new breed of financial institutions that act both as banks to hold their assets in a secure location and trading platforms to facilitate trading in the open market.

24.     The most prominent and successful of these institutions is Coinbase.  Combining the features of a bank, brokerage, and stock exchange, Coinbase acts as a custodian for customers' funds, allows customers to trade cryptocurrencies, and operates an exchange where trading occurs.

25.     Coinbase was founded in 2012 and has quickly grown into the largest and most profitable institution in the world of cryptocurrency.  At its initial public offering in 2021, Coinbase's estimated value was reportedly $47 billion.  Today, Coinbase claims to have over 103 million customers and handles customer trades totaling more than $309 billion on a quarterly basis.

26.     Coinbase's business model depends on persuading ordinary consumers to begin trading cryptocurrency.  Coinbase's annual report for 2021 touts its "simple onboarding process that allows retail users to sign up and quickly purchase their first crypto asset" and claims that Coinbase is "a primary on-ramp for customers' journeys into the cryptoeconomy."

27.     As part of these efforts, Coinbase also encourages people to invest their retirement savings in cryptocurrency through web advertisements like "The Crypto Guide to Retirement Savings (https://www.coinbase.com/learn/crypto-basics/retirement) and through its partnership with 401(k) plan provider ForUsAll.

**C.      Coinbase Advertises its Platform as Secure**

28.     Because it understands that public faith in the security of its platform is critical to the success of its business, Coinbase subjects consumers to a barrage of representations on its website stating that its cryptocurrency storage is secure, that it offers "best in class storage," has

"industry-leading security," that it is the "most trusted crypto exchange," that it uses "state-of-the-art encryption," that "your assets are protected," and that it offers "multifaceted risk management programs designed to protect customers' assets."

**C** SECURITY

# The most trusted crypto exchange

103+ million users trust us, and so can you.

**Sign up now**



Industry-leading security

Additional security options on all of your devices provide more ways to keep your crypto safe and secure.



## Your assets are protected

Your crypto is your crypto. It's that simple. Coinbase doesn't use, or lend, your assets without your permission. Also, we offer the most secure and multifaceted risk management programs designed to protect our customers' assets.

Learn more →

FIRST AMENDED COMPLAINT

# The proof is in our platform.

Here's why you can trust us:



## We're the largest public crypto company in the world

In April 2021, Coinbase became the largest publicly traded crypto company in the world. That means we operate with more financial transparency, and make our financial statements available each quarter.

Learn more →



# We use state-of-the-art encryption and security

The technology that powers our platform was developed with industry-leading security and encryption at its core. Our security team is constantly working to make sure you and your assets are protected from emerging threats.

## Most trusted. Most secure.

Learn why 89M+ people around the world trust us as their entry point into the cryptoeconomy.

https://www.coinbase.com/security (captured July 6, 2022)

FIRST AMENDED COMPLAINT



We offer the finest tools to protect your account

From auto-enrolled 2 factor-authentication (with security key support), password protection, to multi-approval withdrawals in Coinbase Vault, we provide powerful security features to all our users.

29.     This advertising and the user interface Coinbase employs is designed to lure consumers to deposit their hard-earned funds with Coinbase.  Throughout its advertising and sign-up process Coinbase represents that it employs extensive security measures to get users to create accounts and start depositing funds and buying cryptocurrency with Coinbase.

30.     As soon as an individual clicks on the "Sign Up" button to create a Coinbase account, they are presented with representations touting the platform's security.

An individual account is the best way to manage your personal crypto portfolio.

Access to hundreds of cryptocurrencies
Buy, sell, and track your crypto all in the one place.

Safe & secure
Industry best practices are used to keep your crypto safe.

31.     Coinbase's user interface constantly reassures new customers on the safety and security of the platform, and consumers rely on these representations when they invest their hard-earned savings with Coinbase.  Consumers believe that these funds are safe with Coinbase.

32.     Coinbase separately represents that each aspect of its services is secure:







33.     Indeed, the front page of Coinbase's website explains that the purpose of the platform is to provide a place to "securely buy, sell, and manage hundreds of cryptocurrencies":

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9



34.     Coinbase's representations are not limited to its own website.  Coinbase's search engine marketing similarly represents that Coinbase is a secure location to store cryptocurrency. Below is Coinbase's search engine listing on Google:

35.     Similarly, Coinbase's social media advertising claims that Coinbase is the "safest and most secure crypto experience" on the market:

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED COMPLAINT

36.     Coinbase has also represented to consumers that it has "never been hacked" and that it maintained insurance to protect their digital holdings. https://www.coinbase.com/security (captured July 6, 2022).

> **How is my crypto stored?**
>
> Thanks to our best-in-class security practices, we're the only crypto exchange to have never been hacked. We strategically store over 98% of deposits offline in secure cold storage facilities that are guarded and monitored 24/7. We also maintain an extensive insurance policy to protect assets held online.

**D.     Coinbase Advertises Account Protections and Customer Service**

37.     Coinbase represents that they proactively protect consumers' accounts and take measures to prevent theft.

38.     For example, Coinbase represents that it proactively monitors for data breaches and threats and will "automatically secure your login credentials if it looks like your account may be at risk."

> **Enhanced Account Protections**                                      —
>
> We monitor third-party data breaches and darknet markets for threat indicators, and automatically secure your login credentials if it looks like your account may be at risk.
>
> Learn more

39.     Coinbase claims that it provides "Proactive Security Notifications" that would allow consumers to lock their accounts in the event of a hack.

> **Proactive Security Notifications**                                   —
>
> For all main security changes in your account settings, we will communicate with you and even give you the option of locking your account.

**FIRST AMENDED COMPLAINT**

40.     Coinbase advertises that if there are suspicious transactions, "we'll give you the option to cancel a transaction before it's submitted to the blockchain."

### Behind the Scenes                                      —

Our machine learning models evaluate your crypto transactions, and we'll give you the option to cancel a transaction before it's submitted to the blockchain if things don't look right.

41.     And while Coinbase encourages all customers to follow "good security practices," the company acknowledges that "[s]ince most people are not specifically trained in computer security, Coinbase can manage the bulk of these security measures on your behalf." https://help.coinbase.com/en/coinbase/privacy-and-security/other/is-bitcoin-secure-has-the-bitcoin-network-ever-been-hacked (accessed Sept. 29, 2022).

As a holder of bitcoin, you have tremendous power over your money. Because of this, it is important to follow good security practices to protect your funds. Since most people are not specifically trained in computer security, Coinbase can manage the bulk of these security measures on your behalf.

42.     Coinbase also claims that it offers "24/7 live support" for consumers who may have had their accounts compromised.  https://www.coinbase.com/security (accessed Sept. 29, 2022).



We're here to help.

Check out these resources to learn more:

| Q | ☑ | ☰ |
|---|---|---|
| **Customer Support** | **Help Center** | **Coinbase Learn** |
| 24/7 live support | Quick solutions to common questions | Guides, tips, market updates and more |
| Learn more → | Learn more → | Learn more → |

FIRST AMENDED COMPLAINT

### E.      Plaintiffs Relied On Coinbase's Representations

43.      Mr. Aggarwal read Coinbase's representations about Coinbase's security measures on Coinbase's website and in its marketing materials and relied on those representations in purchasing and storing cryptocurrency with Coinbase.

44.      Likewise, Mr. El Bermawy read the representations regarding Coinbase's security measures on Coinbase's website and in its marketing materials and relied on those representations in purchasing and storing cryptocurrency with Coinbase.

45.      Based on Coinbase's representations, Mr. El Bermawy believed his funds would be safe with Coinbase, that Coinbase would be able to help prevent his funds from being stolen and that Coinbase would help protect him in the event his account was compromised.

### F.      Coinbase Admits It Must Employ Bank-Level Security

46.      In addition to its advertising, Coinbase admits to investors that it must provide bank-level security.  In a recent quarterly SEC disclosure statement, Coinbase represented that "we are required to safeguard customers' assets using bank-level security standards applicable to our wallet and storage systems, as well as our financial management systems related to such custodial functions."  Coinbase Global, Inc., Quarterly Report (Form 10-Q), at 94 (August 9, 2022), (available at

https://www.sec.gov/ix?doc=/Archives/edgar/data/1679788/000167978822000085/coin-20220630.htm).

### G.      Coinbase's Representations About Security Are Material to Consumers

47.      Coinbase well knows that its communications to the public about the security of its services are extremely important to consumers.  On May 10, 2022, during a quarterly earnings call, Coinbase co-founder and CEO Brian Armstrong explained that the reason Coinbase makes representations about its security features is to create a "competitive moat" that Coinbase uses to create a business advantage over competitors in the cryptocurrency industry.  May 10, 2022 First Quarter 2022 Earnings Call (available at

https://s27.q4cdn.com/397450999/files/doc_financials/2022/q1/Coinbase-Q1'22-Earnings-Call-Transcript.pdf).  Mr. Armstrong went on to state:

> It comes down to cybersecurity – we're storing more crypto securely for our customers. And so whenever people are coming into a new industry, they generally want to go with the one that it's been around the longest, it's trusted by the most people, it has the most number of users. Coinbase is really the only crypto company that's public in this environment. And we're storing such a large amount of crypto that I think that's a defensible moat *because basically when people trust us, they store crypto with us*.

(*Id.* (emphasis added).)

48.     Coinbase is also well aware of the danger of hacking.  In describing risks that potentially threaten its business in its 2021 Form 10-K, Coinbase stated: "cyberattacks and security breaches of our platform, or those impacting our customers or third parties, could adversely impact our brand and reputation and our business, operating results, and financial condition."  Coinbase Global, Inc. 2021 Annual Report (Form 10-K) at 26 (filed Feb. 24, 2022) (available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001679788/000167978822000031/coin-20211231.htm).

49.     As Coinbase itself acknowledges, both in filings to the SEC as well as statements made to its investors, these representations regarding security are material to consumers and essential for Coinbase to maintain a competitive edge in the cryptocurrency industry.  Gaining the trust of consumers by marketing its platform as the "most secure" is a critical element of Coinbase's brand and competitive strategy.

**H.     The 2021 Coinbase Security Failure**

50.     Unfortunately, Coinbase's representations regarding the security of its platform have proven untrue.  Despite claiming to be "the only crypto exchange to have never been hacked," Coinbase has been hacked and had customer funds stolen in multiple instances within the last two years.

51.     Between March and May 20, 2021, attackers gained access to Coinbase customer accounts and stole customers' funds by transferring them off the Coinbase platform.  The breach affected more than 6,000 consumers.

52. Coinbase acknowledged the 2021 security failure in a filing with the California Attorney General made pursuant to California's data breach statute, Cal. Civ. Code § 1798.82(a).[1]

53. Prior to Coinbase's 2021 security failure, Coinbase used a two-factor identification security protocol using SMS (text messages).  Users would access the Coinbase app or website and would be asked to create a password meeting certain requirements.  During this process, Coinbase would require the user to provide a cellphone number.  Coinbase would text a one-time authentication code that the user would have to input to create the password for their Coinbase account.  Once the user input the code texted by Coinbase, Coinbase would then recognize the device and user's password as secure.  The same process applied for changing passwords: the user would have to input their old password and a new one-time authentication code texted by Coinbase.  By Coinbase's own admission, the attackers in the 2021 hack "took advantage of a flaw in Coinbase's SMS Account Recovery process."

54. Coinbase acknowledged it was aware that a security vulnerability in its platform allowed hackers to access its customers full name, email address, home address, date of birth, IP addresses for account activity, transaction history, account holdings, and account balance.

55. Coinbase further admitted that it was aware that a security vulnerability in its platform allowed hackers to access its customers' accounts and change the email, phone number, or any other information associated with their accounts.

56. Following the security breach, Coinbase claimed that it had "updated our SMS Account Recovery protocols to prevent any further bypassing of that authentication process."

57. Coinbase also announced that it had refunded customers for the cryptocurrency they had lost from their accounts as a result of the 2021 hack.

---

[1] Coinbase, Inc. March 17, 2021 Data Breach Sample Notice (available at https://oag.ca.gov/system/files/09-24-2021%20Customer%20Notification.pdf).

**I.     Coinbase Fails to Render Its Accounts Secure, and Plaintiffs' Money Is Stolen**

58.     Whatever security updates Coinbase may have made following the 2021 security failure have been insufficient to prevent customers from continuing to have funds stolen by hackers in the year since the 2021 incident.

59.     One measure Coinbase took was to encourage customers to use an outsourced security program called Google Authenticator.  Unlike text message-based authentication, Google Authenticator relies on a software application installed on a user's smartphone to deliver the authentication code, bypassing vulnerabilities in text message technology.  This measure did not render Coinbase's platform secure because it is Coinbase's own security that is lacking.

60.     Before using Coinbase, Mr. Aggarwal visited the website and read and relied on Coinbase's representations about its security.  Like all users of Coinbase, Mr. Aggarwal had to go to the Coinbase website because it provided him the instructions needed to set up his account.  He followed those instructions and relied on Coinbase's representations regarding the security of its systems.  Mr. Aggarwal is one of the Coinbase customers who implemented Google Authenticator at Coinbase's urging.

61.     Before using Coinbase, Mr. El Bermawy also visited the website and read and relied on Coinbase's representations about its security.  Like all users of Coinbase, Mr. El Bermawy had to go to the Coinbase website because it provided him the instructions needed to set up his account.  He followed those instructions and relied on Coinbase's representations regarding the security of its systems.  Mr. El Bermawy implemented two-factor authentication on his Coinbase account using SMS-based authentication.

62.     Hackers nonetheless bypassed Coinbase's security and drained Mr. Aggarwal and Mr. El Bermawy's accounts.

63.     Between February 2021 and April 2022, Mr. Aggarwal accumulated an investment in Bitcoin totaling approximately $200,000 in value, which he stored in his Coinbase wallet.

64.     On April 20, 2022, Mr. Aggarwal began having trouble logging into his account. He attempted to reset his password through Coinbase's password reset system to no avail.  Relying

on Coinbase's representations that its platform was secure, he believed the issue would be resolved soon.

65.      On April 24, 2022, Mr. Aggarwal received a call purporting to be from Coinbase acknowledging that he had had difficulty accessing his account and suggesting that he try resetting his password.  Later that day, Mr. Aggarwal again attempted to reset his password using Coinbase's system, but was unsuccessful.

66.      The same day, on April 24, 2022, all of Mr. Aggarwal's cryptocurrency was rapidly transferred to an external account.  Within a span of just 49 minutes, Mr. Aggarwal's account was drained without his authorization through more than 6,000 small transfers of cryptocurrency totaling approximately $190,000 in value.

67.      Unaware that his account had been emptied, Mr. Aggarwal tried in vain for days to regain access to his account.  On April 25 and 26, 2022, Mr. Aggarwal called a Coinbase support line.  The system refused to connect him with a human being; instead, he received a recorded message stating that his phone number was not associated with his account.  That was inaccurate because Mr. Aggarwal was using the same telephone number he had registered with his account.  It was also contrary to Coinbase's representations on its website that users would be able to get help by phone from Coinbase's team:

Get the help you need, when you need it

You can always contact our support team by phone or messaging to speak with our virtual assistant, or depending on the hours, with a real live support agent. You can also check out our Help Center for quick solutions to common problems.

68.     On April 27, 2022, Mr. Aggarwal attempted to reach Coinbase through its online support link.  He again could not speak with a human being; instead, he received an email stating that his email address was not associated with his Coinbase account.  That was inaccurate because Mr. Aggarwal was using the same email address he had registered with his account.

69.     Finally, Mr. Aggarwal was able to make contact with individuals at Coinbase.  On April 28, 2022, Coinbase finally put a hold on Mr. Aggarwal's account while it investigated the issue.  By that time, it was too late to stop the fraudulent transfers.

70.     Coinbase refused to repay Mr. Aggarwal.  Nor did it remedy its internal security problems that led to Mr. Aggarwal's losses.

71.     Mr. Aggarwal remains interested in investing cryptocurrencies, hopes to continue investing in cryptocurrencies in the future, and would continue using Coinbase's services should it resolve the issues identified in this pleading.

72.     On or around July 21, 2022, Mr. El Bermawy fell victim to a hack that was similar to the one Mr. Aggarwal was subject to. Mr. El Bermawy secured his Coinbase account through the use of SMS-based two-factor authentication, but hackers were nevertheless able to access his account.

73.     Early in the morning of July 21, 2022, Mr. El Bermawy was alerted to someone having changed his Coinbase account password.  Concerned by this activity, Mr. El Bermawy attempted to sign in to his Coinbase account but found he was unable to sign in.  He attempted to sign in multiple times from both his phone and his computer to no avail.

74.     Hours after the hack, Mr. El Bermawy was finally able to access his account after verifying his identification with Coinbase.  At this point, Mr. El Bermawy discovered that the hackers had stolen approximately $70,000 worth of cryptocurrency and USD, leaving only $0.19 in his account.

75.     Mr. El Bermawy immediately contacted Coinbase customer support.  After several hours without response, Coinbase informed Mr. El Bermawy that their security team "found a set of login credentials published on the web that look like they match [Mr. El Bermawy's] Coinbase account credentials."

76.     Instead of offering Mr. El Bermawy assistance in recovering his stolen cryptocurrency or otherwise making him whole for his loss, Coinbase customer support informed Mr. El Bermawy that Coinbase could "no longer support [his] account" and that "for security reasons" they were "unable to elaborate on [their] internal decision process."

77.     After the hack, Mr. El Bermawy was able to access his account, but Coinbase had implemented a restriction that only allowed Mr. El Bermawy to withdraw his remaining funds.

78.     Coinbase's response to Mr. El Bermawy being hacked despite implementing the recommended security measures was to kick him off their platform without any real explanation, and instead offering only the meaningless remedy of allowing Mr. El Bermawy to withdraw the remaining $0.19 left in his account.

79.     Since the hack, Coinbase has sent Mr. El Bermawy over 100 emails purportedly confirming that Mr. El Bermawy's photo ID has been verified despite Mr. El Bermawy taking no action to access his account or to verify his ID with Coinbase.

80.     Mr. El Bermawy remains interested in investing in cryptocurrencies, hopes to continue investing in cryptocurrencies in the future, and would continue using Coinbase's services should it fully resolve the issues identified in this pleading.

**J.     The Security Breaches as to Plaintiffs' Accounts Are Endemic to Coinbase's System**

81.     After several frustrating days of being told that he did not have an account with Coinbase, Coinbase finally informed Mr. Aggarwal that his account had been emptied.  Coinbase also admitted to Mr. Aggarwal that whoever accessed the account had obtained the correct Google Authenticator code to log into the account.  This detail is important because Mr. Aggarwal logged into Coinbase through his phone, and his phone never left his control during the attack.

82.     Mr. Aggarwal is not aware of any viruses, worms, or other malware such that the security breach occurred on his end.

83.     Upon information and belief, Mr. Aggarwal was not victim to any third-party phishing attack or sim swap attack whereby hackers obtained his Coinbase login information or Google Authenticator security key.

84.     In light of these facts, the only explanation for how Mr. Aggarwal's account was emptied is that a third party—either a hacker or Coinbase employee—was able to see his two-factor authentication code on Coinbase's system because Coinbase did not take sufficient care to prevent access to that information.

**K.     Coinbase's Protections and Customer Support Offer Empty Reassurances**

85.     Despite Coinbase's representations that it offers proactive security protections, hackers were able to access and empty Plaintiffs' accounts without any intervention from Coinbase.

86.     At no point did Mr. Aggarwal receive a proactive security notification alerting him to the change in his login credentials. As a result, Mr. Aggarwal had no notice that hackers were actively draining his account.

87.     Mr. El Bermawy did receive notice that his account password had been changed, but once he received the notice it was already too late to prevent his account from being emptied.

88.     Despite the suspicious account activity, at no point did Coinbase "automatically secure [Plaintiffs'] login credentials" or "give [Plaintiffs'] the option to cancel a transaction . . . if things don't look right."

89.     For both Plaintiffs, Coinbase's promised "24/7 live support" offered too little, too late.  Neither Plaintiff could get in touch with a live agent in time to prevent a loss.

**L.     Coinbase Refuses to Make Plaintiffs Whole**

90.     Coinbase has refused to restore the value of Plaintiffs' accounts, unlike its restoration of funds to users in the 2021 security failure.

91.     As a result of Plaintiffs' experience, it is clear that security issues continue to plague Coinbase's security procedures and that customers remain vulnerable to theft of their savings.

92.     It is also clear, both from Plaintiffs' experience and from the 2021 security collapse, that Coinbase's marketing claims to be a "secure" platform that has "never [] been hacked" are false and misleading.  Coinbase knew that its claims to be a "secure" platform that had "never [] been hacked" were false and misleading but made those statements to induce Plaintiffs, the Class, and the general public to do business with Coinbase for Coinbase's pecuniary gain.

93.     Coinbase's intransigence in refusing to refund Plaintiffs' losses may be explained by the unlawful disclaimer of liability in its User Agreement.  Despite its representations about security and that it maintains insurance to protect user accounts, buried in the middle of a user agreement totaling more than 45,000 words on the Coinbase website (in Section 8.2), the following provision purports to exculpate Coinbase for all liability for its own negligence:

> In no event shall Coinbase, its affiliates and service providers, or any of their respective officers, directors, agents, joint venturers, employees or representatives, be liable (i) for any amount greater than the value of the supported digital assets associated with your digital asset wallet at the time of the event or circumstance giving rise to your claim or (ii) for any lost profits, loss of goodwill or reputation, loss of data, diminution in value or business opportunity, any loss, damage, corruption or breach of data or any other intangible property or any special, incidental, indirect, intangible, or consequential damages, whether based in contract, tort, negligence, strict liability, or otherwise, arising out of or in connection with any use of the Coinbase site or the Coinbase services, or this agreement, even if Coinbase has been advised of or knew or should have known of the possibility of such damages, and notwithstanding the failure of any agreed or other remedy of its essential purpose, except to the extent of a final judicial determination that such damages were a result of Coinbase's gross negligence, fraud, willful misconduct or intentional violation of law.

(User Agreement Section 8.2.)

94.     This provision is unconscionable and unenforceable.  It is also illegal under California public policy prohibiting exculpation for negligence in contracts that affect the public interest, including contracts for bailment and banking relationships.

95.     Coinbase has included multiple provisions within its User Agreement which are unconscionable and unenforceable. This includes its arbitration provision as well as a prohibition on injunctive and declaratory relief that is illegal under California law.

**M.    Coinbase's Misrepresentations and Security Failures Continue**

96.     Coinbase's misrepresentations about its security continue to deceive members of the general public.  These misrepresentations are targeted to entice consumers into creating accounts and depositing their hard-earned funds with Coinbase.  These misrepresentations also continue to give current Coinbase accountholders false confidence that their funds are protected and secure with Coinbase.

97.     Upon information and belief, consumers other than Plaintiffs have suffered and continue to suffer security breaches and losses of funds similar to those experienced by Plaintiffs.

98.     Other consumers have similarly complained that cryptocurrency was stolen from their Coinbase accounts despite them taking the precautions that Coinbase recommends:





99.     Users on internet forums such as Reddit have also recently reported similar experiences losing funds on Coinbase due to security compromises, despite use of Coinbase's recommended two-factor authentication.

100.    One Reddit user posting to the /r/Coinbase community on Reddit, complained that "[m]y Coinbase account with Google authenticator enabled was just hacked." https://www.reddit.com/r/CoinBase/comments/99rbqd/my_coinbase_account_with_google_authenticator/ (captured August 18, 2022).

101.    In April 2022, another Reddit user similarly complained on the /r/Coinbase community on Reddit that despite using Google Authenticator, "[s]omeone was able to access my account without my authorization" which resulted in the user losing $10,000 worth of Bitcoin.

1   https://www.reddit.com/r/CoinBase/comments/tz88mt/hacked_coinbase_account_lost_10k/

2   (captured August 18, 2022).

3       102.    Other victims have since come forward with similar allegations.

4       103.    On information and belief, one consumer claims that on or around August 10, 2022,

5   he found he was locked out of his account.  Despite attempting to contact Coinbase support, he was

6   unable to access his account for several weeks during which time a hacker was able to access and

7   empty his account of approximately $120,000.  At no point did Coinbase take steps to prevent the

8   theft.

9       104.    On information and belief, another consumer claims that in early September 2022,

10   he received an alert of a login to his Coinbase account from a new device.  Suspicious of this

11   attempted login, the consumer alleges that he contacted Coinbase support who requested that he

12   verify his identification by uploading a photo of his ID through a third-party site.  After he

13   followed these instructions, he claims to have found that a hacker had been able to set up an

14   alternative two-factor authentication application that the hacker had used to access his account.

15   The hacker was then able to transfer approximately $6,000 in Ethereum shares and $14,000 in

16   funds to a debit card not associated with his bank.  The consumer reports that at no point did

17   Coinbase alert him of the change to his two-factor authentication, the linking of a new debit card to

18   his account or the transfer of all his funds.

19       105.    Coinbase's conduct alleged herein was fraudulent, oppressive, malicious and done

20   with conscious disregard of Plaintiffs' and the Class's rights or the risk to the general public.  As a

21   result of Coinbase's fraudulent, oppressive, and malicious conduct, Plaintiffs and the Class have

22   suffered cruel and unjust hardship in violation of their rights.

23                           **CLASS ACTION ALLEGATIONS**

24       106.    This action is brought and may properly proceed as a class action pursuant to the

25   provisions of Federal Rule of Civil Procedure 23.

26       107.    Plaintiffs seek certification of a Class which is composed of and defined as follows:

27           All current and former Coinbase users and/or consumers in the United
             States who registered for a Coinbase account from April 1, 2021

28           through such time as Class notice is given, who maintained funds

and/or cryptocurrency in their Coinbase accounts, and who were subsequently deprived of access to, or lost their funds and/or cryptocurrency.

108.     Excluded from the Class are Defendants' officers and directors, current or former Coinbase employees, as well as their immediate family members, as well as any judge, justice, or judicial officer presiding over this matter and members of their immediate families and staff.

109.     **Numerosity**: The number of Class members is so large that the joinder of all its members is impracticable.  The exact number of Class members can be determined from information in the possession and control of the Defendant, but based on publicly available information, it appears that the number of class members is likely in the thousands.

110.     **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. Defendants failed to secure the accounts of customers, and thereby injured all members of the Class in substantially identical fashion.

111.     **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are not antagonistic to or in conflict with the interests they seek to represent as Class representatives.

112.     Plaintiffs' counsel is experienced in prosecuting class actions, is committed to protecting consumers, and intends to prosecute this action vigorously.

113.     **Common Violations**: Defendants have acted or refused to act on grounds that apply generally to the class, including by failing to secure consumer accounts, and making inaccurate representations about their products to the public, and failing to provide meaningful customer service related to security breaches such that final injunctive relief is appropriate respecting the class as a whole.

114.     **Existence of Predominance of Common Questions of Fact and Law:** Numerous common issues of law and fact exist and predominate over questions affecting only individual members.  These issues include, without limitation:

    a.     Whether the requirements regarding transfers of electronic funds in the custodial accounts of consumers in the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq*. ("EFTA") apply to Coinbase;

b.   Whether Defendants violated the EFTA;

c.   Whether Regulation E, 12 C.F.R. § 1005.11, applies to Coinbase;

d.   Whether Defendants violated Regulation E;

e.   The nature, extent and mechanics of the customer service processes Coinbase makes available for consumers to address security breaches;

f.   The sufficiency of the customer service processes that Coinbase makes available for consumers to address security breaches;

g.   The nature, extent and mechanics of the security measures that Coinbase takes with regard to the accounts maintained on its system;

h.   Whether Defendants were, or should have been, aware of potential vulnerabilities in their security;

i.   The nature, scope and extent of the obligation that Coinbase owes to depositors and users of their system;

j.   Whether Defendants failed to properly secure customers' Coinbase accounts, funds, and cryptocurrency;

k.   Whether Defendants owed a duty to safely care for and maintain the cryptocurrency in the wallets of class members;

l.   Whether Defendants violated the duties of care that they owed to Plaintiffs and the Class;

m.   Whether Defendants' statements that the Coinbase system was secure were materially false and misleading;

n.   Whether Section 8.2 of the Coinbase user agreement is illegal, unconscionable or otherwise unenforceable;

o.   Whether consumers were harmed by Defendants' security breaches;

p.   Whether Defendants should have to repay the monies lost by the Class;

q.   Whether Defendants should be required to make restitution to the Class;

r.   Whether Defendants should be required to pay damages to the Class; and

s.   Whether exemplary damages should be assessed against Coinbase.

115.    These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

116.    Absent certification of a class, the equitable relief sought by Plaintiffs will create the possibility of inconsistent judgments and/or obligations among Defendants.

117.    **Superiority**: A class action is also superior to other available methods for the fair and efficient adjudication of this controversy.  Requiring Class members to pursue their claims individually would invite a host of separate suits, with concomitant duplication of costs, attorneys' fees, and demands on judicial resources.  Furthermore, as the damages suffered by the individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the Class individually to seek redress of the wrongs perpetrated by Defendants.  Plaintiffs know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action
**Against All Defendants**
**Violation of the Electronic Funds Transfer Act ("EFTA")**
**(15 U.S.C. § 1693 *et seq.*)**

118.    Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

119.    Defendants are "financial institutions" as defined by the EFTA because they are persons who, directly or indirectly, hold an account belonging to a consumer.

120.    Plaintiffs and the Class are "consumers" as defined by the EFTA because they are natural persons.

121.    The Coinbase accounts owned by Plaintiffs and the Class are "accounts" as defined by the EFTA because they are asset accounts established primarily for personal, family, or household purposes.

122.    The unauthorized transfers from Plaintiffs' and the Class's accounts were "unauthorized electronic fund transfers" as defined by the EFTA because they were electronic fund

transfers from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit.

123.    Plaintiffs and the Class provided timely actual and/or constructive notice to Defendants of the unauthorized electronic transfers from their accounts.

124.    Defendants failed to timely investigate the unauthorized electronic transfers from Plaintiffs' and the Class's accounts as required by 15 U.S.C. § 1693f(a)(3) and 15 U.S.C. § 1693f(d).

125.    Defendants failed to timely correct the unauthorized transfers from Plaintiffs' and the Class's accounts by timely crediting their accounts, in violation of 15 U.S.C. § 1693f(b)-(c).

126.    Further, because Coinbase never provided disclosures to Plaintiffs and the Class that were compliant with 12 C.F.R. § 1005.7(b), Plaintiffs and the Class have no liability for the unauthorized electronic fund transfers under 15 U.S.C. § 1693g and/or 12 C.F.R. § 1005.6.

127.    Coinbase lacked any reasonable basis to believe that the unauthorized transfers from Plaintiffs' and the Class's accounts were not in error, but nonetheless wrongfully, knowingly, and willfully concluded that the unauthorized transfers were not in error in violation of 15 U.S.C. § 1693f(e).

128.    As a result of Coinbase's failures to comply with the statute, Plaintiffs and the Class were injured as alleged above.

129.    Plaintiffs and the Class are therefore entitled to actual, statutory, and treble damages, costs, and attorneys' fees.

**Second Cause of Action**
**Against All Defendants**
**Violation of the EFTA and Regulation E Customer Service Provisions**
**(15 U.S.C. § 1693f(f)(6); 12 C.F.R. § 1005.11(a)(7))**

130.    Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

131.    The EFTA, 15 U.S.C. § 1693f(f)(6) and Regulation E, 12 C.F.R. § 1005.11(a)(7) 4 require financial institutions to address "a consumer's request for additional information or clarification concerning an electronic fund transfer."

132.     Defendants violated the EFTA and Regulation E by failing to timely provide information or clarification concerning an electronic fund transfer, including requests Plaintiffs and the Class made to determine whether there were unauthorized electronic transfers from their accounts.  *See* 15 U.S.C. § 1693f(f)(6); 12 C.F.R. § 1005.11(vii).

133.     Accordingly, Defendants are liable to Plaintiffs and the Class for statutory damages, attorneys' fees, and costs for this claim pursuant to 15 U.S.C § 1693m.

**Third Cause of Action**
**Against All Defendants**
**Violation of the EFTA and Regulation E Disclosure Provisions**
**(15 U.S.C § 1693c, 12 C.F.R. § 1005.7)**

134.     Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

135.     15 U.S.C § 1693c and Regulation E, 12 C.F.R. § 1005.7, require financial institutions to make the disclosures set forth in § 1005.7(b) before the first electronic fund transfer is made involving a consumer's account.

136.     Defendants violated Regulation E by failing to provide adequate initial disclosures to Plaintiffs and the Class including, as applicable: (1) a summary of Plaintiffs' and the Class's liability, under 12 CFR § 1005.6 or under state or other applicable law or agreement, for unauthorized electronic fund transfers; (2) the telephone number and address of the person or office to be notified when Plaintiffs or a member of the Class believes that an unauthorized electronic fund transfer has been or may be made; (3) Defendants' business days; (4) the type of electronic fund transfers that Plaintiffs and the Class may make and any limitations on the frequency and dollar amount of transfers; (5) any fees imposed by Defendants for electronic fund transfers or for the right to make transfers; (6) a summary of Plaintiffs' and the Class's right to receipts and periodic statements, as provided in 12 CFR § 1005.9 of this part, and notices regarding preauthorized transfers as provided in 12 CFR § 1005.10(a) and (d); (7) a summary of Plaintiffs' and the Class Members' right to stop payment of a preauthorized electronic fund transfer and the procedure for placing a stop payment order, as provided in 12 CFR § 1005.10(c); (8) a summary of Defendants' liability to Plaintiffs and Class Members under section 910 of the Act for failure to

make or to stop certain transfers; (9) the circumstances under which, in the ordinary course of business, Defendants may provide information concerning Plaintiffs' and the Class's account to third parties; (10) a notice that is substantially similar to Model Form A-3 as set out in appendix A of 12 CFR 1005.1, *et seq.*, concerning error resolution; and (11) a notice that a fee may be imposed by an automated teller machine operator as defined in 12 CFR § 1005.16(a), when Plaintiffs or a Class Member initiates an electronic fund transfer or makes a balance inquiry, and by any network used to complete the transaction.

137.    As a result of Defendants' violation of the notice requirements of 15 U.S.C. § 1693c and Regulation E, Plaintiffs and Class Members are entitled to statutory damages, attorneys' fees, and costs.

**Fourth Cause of Action**
**Against All Defendants**
**Violation of California Uniform Commercial Code Division 8**
**(Cal. Com. Code § 8507(b))**

138.    Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

139.    In the Coinbase User Agreement, Defendants characterize Coinbase, Inc. as a "securities intermediary" and characterize Coinbase wallets as "financial assets" subject to Division 8 of the California Uniform Commercial Code ("UCC").

140.    Under UCC § 8102(a)(7), the owner of assets held in an account with a securities intermediary is an "entitlement holder."

141.    If Defendants' characterization of the relationship is correct, at the time of the unauthorized transfers alleged herein, Plaintiffs and the Class were "entitlement holders" with respect to the assets held in Plaintiffs' and Class's Coinbase accounts.

142.    Under UCC § 8102(a)(8), an order for a securities intermediary to transfer assets is an "entitlement order."

143.    Under UCC § 8107(b), an entitlement order is only "effective" if it is made by the entitlement holder or an authorized agent or ratified by the entitlement holder.

144.     The orders for the unauthorized transfers from Plaintiffs' and the Class's Coinbase accounts alleged herein were ineffective because they were not made Plaintiffs or by Plaintiffs' authorized representatives, nor were they ratified by Plaintiffs.

145.     Defendants completed the unauthorized transfers alleged herein despite the fact that they were made pursuant to ineffective entitlement orders.

146.     Pursuant to UCC § 8507(b), Defendants are obligated to credit Plaintiffs' and the Class's accounts to correct the unauthorized transfers and to pay or credit any payments or distributions that Plaintiffs and the Class did not receive as a result of the wrongful transfers, in addition to liability for damages.

147.     As a direct and foreseeable consequence of Defendants' transfer of Plaintiffs' and the Class's assets pursuant to invalid entitlement orders and Defendants' failure to credit Plaintiffs' and the Class's accounts to correct the unauthorized transfers, Plaintiffs and the Class were injured.

**Fifth Cause of Action**
**Against All Defendants**
**Bailment**
**(California Common Law and Civil Code §§ 1813, et seq.)**

148.     Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

149.     Plaintiffs and the Class deposited cryptocurrencies and other funds with Defendants in order to use, store, keep, sell, trade, or exchange cryptocurrencies.

150.     Plaintiffs and the Class provided consideration for the cryptocurrencies and funds deposited with Defendants in the form of fees and commissions.

151.     Defendants, as bailees of Plaintiffs' and the Class's personal property, had an obligation to return or account for the deposited personal property upon demand.

152.     By their own acts or omissions, Defendants caused the personal property deposited by Plaintiffs and the Class to be lost.

153.     Defendants have refused to return the personal property deposited by Plaintiffs and the Class.

154.   Defendants have refused to provide complete disclosure to Plaintiffs and the Class regarding the circumstances under which the loss of property occurred, as a result of which Defendants are "presumed to have willfully, or by gross negligence, permitted the loss or injury to occur" pursuant to Cal. Civ. Code § 1838.

155.   As a result of Defendants' failure to uphold their obligations as bailees, Plaintiffs and the Class have been injured because they are deprived of their personal property.

**Sixth Cause of Action**
**Against All Defendants**
**Conversion**

156.   Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

157.   Plaintiffs and the Class deposited cryptocurrencies and other funds with Defendants in order to use, store, keep, sell, trade, or exchange cryptocurrencies.

158.   Plaintiffs and the Class owned, possessed, and had a right to possess the property deposited with Defendants.

159.   Defendants have wrongfully refused to return the property deposited by Plaintiffs and the Class upon proper demand.

160.   Defendants have wrongfully disposed of the property deposited by Plaintiffs and the Class by purporting to transfer it to third parties.

161.   Plaintiffs and the Class did not consent to the misconduct described herein.

162.   Plaintiffs and the Class have been injured as a result of Defendants' misconduct.

**Seventh Cause of Action**
**Against All Defendants**
**Breach of Contract**

163.   Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

164.   Plaintiffs and the Class deposited cryptocurrencies and other funds with Defendants in order to use, store, keep, sell, trade, or exchange cryptocurrencies pursuant to the Coinbase User Agreement.

165.    Plaintiffs and the Class provided consideration for the cryptocurrencies and funds deposited with Defendants in the form of fees and commissions.

166.    In the User Agreement, Defendants agreed to hold Plaintiffs' and the Class's assets on behalf of Plaintiffs and the Class, to treat the assets as the property of Plaintiffs and the Class, to follow Plaintiffs' and the Class's instructions with respect to disposition of the assets, and to return the assets to Plaintiffs and the Class upon demand.

167.    Through the conduct alleged above, Defendants breached the User Agreement, including by causing Plaintiffs' and the Class's property to be lost, transferring the property to third parties without Plaintiffs' and the Class's consent, failing to follow Plaintiffs' and the Class's instructions with respect to the disposition of the property, and failing to return the property to Plaintiffs and the Class upon demand.

168.    As a result of Defendants' breach of the User Agreement, Plaintiffs and the Class have been injured.

**Eighth Cause of Action**
**Against All Defendants**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

169.    Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

170.    The Coinbase User Agreement contains an implied covenant of good faith and fair dealing.

171.    Defendants violated the implied covenant of good faith and fair dealing through the conduct alleged above, including by (a) causing Plaintiffs' and the Class's property to be lost, (b) transferring the property to third parties without Plaintiffs' and the Class's consent, (c) failing to follow Plaintiffs' and the Class's instructions with respect to the disposition of the property, (d) failing to return the property to Plaintiffs and the Class upon demand, (e) failing to implement proper security procedures to safeguard Plaintiffs' and the Class's property, (f) failing to respond to requests for information from Plaintiffs and the Class, and (g) failing to comply with the EFTA and UCC with respect to Plaintiffs' and the Class's accounts.

172.    As a result of Defendants' breach of the User Agreement, Plaintiffs and the Class have been injured.

**Ninth Cause of Action**
**Against All Defendants**
**Negligence**

173.    Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

174.    Defendants owed a duty of reasonable care toward Plaintiffs and the Class based upon Defendants' relationship to them.

175.    Defendants breached this duty by negligently, carelessly, and recklessly collecting, maintaining, and controlling its customers' funds, cryptocurrency, and failing to protect them from exposure to unauthorized third parties.

176.    As a direct and foreseeable consequence of Defendants' breaches of their duty of care, Plaintiffs and the Class were injured.

**Tenth Cause of Action**
**Against All Defendants**
**Violation of Consumer Legal Remedies Act ("CLRA")**
**(Cal. Civ. Code §§ 1750, *et seq*.)**

177.    Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

178.    At all relevant times, Plaintiffs and the Class were "consumers" as under the terms of the CLRA as individuals seeking or acquiring, by purchase or lease, goods or services for personal, family, or household purposes.

179.    Defendants' actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CLRA.  The assets involved in the unauthorized transactions are "goods" and Defendants' financial and online platform services are "services" under the CLRA.

180.    As detailed above, Defendants have violated the CLRA by, among other things, making false statements about their services and including unconscionable and/or unlawful provisions in their contracts.

181.   Defendants' misrepresentations were material.  Defendants' violations of the CLRA were a substantial factor in causing Plaintiffs and the Class to use Defendants' services.

182.   As a direct and proximate consequence of the actions as identified above, Plaintiffs and the Class have suffered injury.

183.   Defendants' conduct described herein was malicious, fraudulent, and wanton in that Defendants intentionally and knowingly provided misleading information to Plaintiffs and the Class and refused to remedy the breach of its system long after learning of the inadequacy of its data protection measures and the unauthorized use of customers' accounts.

184.   Defendants' misrepresentations regarding its products and services and its inclusion of unconscionable and unlawful provisions in the Coinbase User Agreement are ongoing and, unless enjoined by the Court, will continue to deceive and cause injury to the general public.

**Eleventh Cause of Action**
**Against All Defendants**
**Violation of California False Advertising Law ("FAL")**
**(Cal. Bus. & Prof. Code §§ 17500, *et seq.*)**

185.   Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

186.    Defendants violated the FAL by seeking to induce consumers, including Plaintiff and the Class, to do business with Defendants by disseminating false and misleading statements regarding Defendants' products and services and matters of fact associated with those products and services, as alleged above.

187.   Defendants' misrepresentations were material.  Defendants' violations of the FAL were a substantial factor in causing Plaintiffs and the Class to use Defendants' services.

188.   As a direct and proximate consequence of the actions as identified above, Plaintiffs and the Class have suffered injury.

189.   Defendants' conduct described herein was malicious, fraudulent, and wanton in that Defendants intentionally and knowingly provided misleading information to Plaintiffs and the Class and refused to remedy the breach of its system long after learning of the inadequacy of its data protection measures and the unauthorized use of customers' accounts.

190.   Defendants' misrepresentations regarding its products and services and its inclusion of unconscionable and unlawful provisions in the Coinbase User Agreement are ongoing and, unless enjoined by the Court, will continue to deceive and cause injury to the general public.

### Twelfth Cause of Action
**Against All Defendants**
**Unfair Competition Law ("UCL")**
**(Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

191.   Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

192.   Plaintiffs and Defendants are "persons" within the meaning of the UCL. Bus. & Prof. Code § 17201.

193.   As alleged above, Defendants have engaged in unlawful, fraudulent and/or unfair conduct that are harmful and deceiving to consumers within the meaning of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL").

194.   Plaintiffs suffered an injury in fact and lost money or property as a result of Defendants' violations of the UCL.

195.   Defendants' conduct is substantially injurious to consumers, offends legislatively declared public policy as announced by the violations of the laws alleged, and is immoral, unethical, oppressive, and unscrupulous.  The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct.  There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

196.   Defendants' unlawful, fraudulent, and unfair conduct identified above is ongoing and, unless enjoined by the Court, will continue to deceive and cause injury to the general public.

### Twelfth Cause of Action
**Against All Defendants**
**Unjust Enrichment**

197.   Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

198.     Plaintiffs and the Class conferred a benefit upon Defendants by depositing funds and cryptocurrencies into their Coinbase accounts, and paid Defendants fees and commissions for the maintenance of those funds and cryptocurrencies and for the transactions conducted on the Coinbase platform.

199.     As a result of Defendants' actions and omissions alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs and the Class.  Under principles of equity, Defendants should not be permitted to retain the commissions and transaction fees paid by Plaintiffs and the Class or the assets held within Plaintiffs' and the Class's accounts.

200.     Plaintiffs and the Class have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray that this Court enter judgment against Defendants and in favor of Plaintiffs and the Class, and issue the following relief:

a.     Injunctive relief, including public injunctive relief;

b.     Declaratory relief;

c.     Compensatory damages;

d.     Statutory damages;

e.     Treble damages;

f.     Restitution;

g.     Disgorgement;

h.     Punitive damages;

i.     Attorneys' fees and costs; and

j.     All such further relief as the Court deems just and proper.

Dated:  September 29, 2022

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By:   /s/ *J. Noah Hagey*
      J. Noah Hagey

*Attorneys for Class Plaintiffs Manish*
*Aggarwal, Mostafa El Bermawy, and Others*
*Similarly Situated*

FIRST AMENDED COMPLAINT

# JURY DEMAND

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury on all causes of action and claims so triable.

Dated:  September 29, 2022

BRAUNHAGEY & BORDEN LLP

By:    /s/ J. Noah Hagey
J. Noah Hagey

*Attorneys for Class Plaintiffs Manish Aggarwal, Mostafa El Bermawy, and Others Similarly Situated*

FIRST AMENDED COMPLAINT

## <u>CERTIFICATE OF SERVICE</u>

I, Samuel Morimoto, declare:

I am over the age of 18 years and not a party to this action.  My business address is BraunHagey & Borden LLP; 118 W 22nd Street, 12th Floor, New York, NY 10011, which is located in the county where the service described below occurred.

I certify that I am readily familiar with the business practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service.  In the ordinary course of business, correspondence so collected is deposited with the United States Postal Service the same day.  I certify that on September 29, 2022, I served a copy of the below-listed document by causing the document to be placed in a sealed envelope, with postage thereon fully prepaid, and depositing the envelope with the United States Postal Service addressed to the recipients designated below.

I also certify that on September 29, 2022, I caused the document(s) listed below to be sent by email to the recipient(s) and email address listed below.  I did not receive, within a reasonable period of time, after the transmission, any electronic message or other indication that the transmission was unsuccessful.

Documents Served:

**1.      FIRST AMENDED CLASS ACTION COMPLAINT**

**Parties Served:**

Matthew W. Turetzky
248 3rd St. #434
Oakland, CA 94607
(510) 256-9629
Email: matt.turetzky@coinbase.com

*Attorney for Defendants Coinbase, Inc. and Coinbase Global, Inc.*

FIRST AMENDED COMPLAINT

1     I declare under penalty of perjury under the laws of the United States that the foregoing is

2  true and correct.

3

4

   Dated: September 29, 2022                              By: _/s/ Samuel Morimoto_____

5                                                                Samuel Morimoto

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT